**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **D'LIVRO BEAUCHAMP,**<br>Individually,<br><br>Plaintiff,<br><br>V.<br><br>**UNITED STATES OF AMERICA,**<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **CIVIL ACTION NO.:** |

# COMPLAINT UNDER THE FEDERAL TORT CLAIMS ACT

Plaintiff, D'Livro Beauchamp, M.D. ("Plaintiff" or "Mr. Beauchamp"), by counsel, brings this action against Defendant United States of America ("United States") and alleges as follows:

## PARTIES

1. Plaintiff, D'Livro Beauchamp, M.D. is an adult individual who, during the events described below, was incarcerated in facilities operated by the Federal Bureau of Prisons ("BOP"), including United States Penitentiary Atlanta ("USP Atlanta") in Atlanta, Georgia, Federal Prison Camp Montgomery ("FPC Montgomery") in Montgomery, Alabama, and Federal Medical Center

Butner ("FMC Butner)" in Butner, North Carolina. His BOP inmate number is 18095-002.

2. Defendant United States of America is the sole defendant in this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671–2680. The BOP is an agency of the United States Department of Justice. Plaintiff seeks recovery for the negligent acts and omissions of federal employees acting within the scope of their employment.

3. At material times, physicians, advanced practice providers, nurses, medical-record personnel, referral coordinators, and other personnel assigned to BOP health services undertook duties concerning Plaintiff's prostate-cancer screening, evaluation, biopsy-result management, documentation, specialist referrals, transfer, and treatment. To the extent that each person whose conduct is charged herein was an employee of the United States within the meaning of 28 U.S.C. § 2671, the United States is responsible under applicable state law for acts and omissions within the scope of that employment.

## JURISDICTION, VENUE, AND ADMINISTRATIVE EXHAUSTION

4. This Court has exclusive subject-matter jurisdiction under 28 U.S.C. § 1346(b)(1). Plaintiff's claims are for personal injury caused by negligent acts

or omissions of federal employees, acting within the scope of employment, under circumstances in which a private person would be liable under the law of the state in which the acts or omissions occurred.

5. This action arises under the FTCA, 28 U.S.C. §§ 2671–2680. The waiver of sovereign immunity is invoked only to the extent authorized by § 1346(b)(1) and subject to the limitations and exceptions established by the FTCA. The claim pleaded here is one for medical negligence and related failures in carrying out Plaintiff's screening, evaluation, management, documentation, scheduling, specialist referral, transfer, and treatment.

6. Venue is proper in the Middle District of Alabama under 28 U.S.C. § 1402(b) because material alleged negligent acts and omissions occurred at FPC Montgomery, located in Montgomery County, Alabama, within the Northern Division of this District. Additional tortious acts and omissions occurred at USP Atlanta in Georgia.

7. On or about June 23, 2025, Plaintiff submitted a written administrative tort claim on Standard Form 95 addressed to the BOP Southeast Regional Office. That submission describes the alleged delay in evaluating a markedly elevated prostate-specific antigen ("PSA"), failure to follow up and communicate a positive prostate biopsy, failure to timely evaluate, manage, document, refer, transfer, and treat the diagnosis, and delay in subsequent

cancer treatment. It states a sum-certain personal-injury demand. Form 95- attached as **Exhibit A.**

8. The subject Form 95 was assigned Administrative Claim Number TRT-MXR-2025-07053 by the United States Department of Justice (DOJ) when it was received. On July 11, 2025, J Latease Bailey-Close, Regional Counsel, with the DOJ gave written acknowledgement of receipt of the claim as being accepted for filing as of July 7, 2025 by the Federal Bureau of Prisons. This July 11, 2025, DOJ Letter acknowledgement of receipt of the claim is attached as **Exhibit B**. This administrative claim is still pending and has not been finally denied by the DOJ via 28 U.S.C. § 2675(a) and is timely filed within 28 U.S.C. § 2401(b). Consequently, all administrative remedies have been exhausted prior to filing suit.

9. Plaintiff seeks damages for the personal injury described in the administrative claim and herein. Plaintiff seeks an amount not exceeding the sum certain administratively presented except as permitted by 28 U.S.C. § 2675(b).

10. Pursuant to OCGA § 9-11-9. l, the Affidavit of Dr. David Reisman, M.D. is attached hereto as **Exhibit C** and is incorporated by reference. Dr Reisman is a duly qualified expert competent to testify in this matter, alleging at least one act of Georgia medical malpractice by defendant, and thus fulfilling the requirements of O.C.G.A. § 911-9.1. As used in this Complaint, the phrase "standard of care" means that degree of care and skill ordinarily employed

by the medical profession generally under similar conditions and like circumstances as pertained to the Defendant’s actions as discussed below.

## COMMON FACTUAL ALLEGATIONS

### A. USP Atlanta, Georgia — delayed diagnosis and failure to follow up

11. Upon his arrival at USP Atlanta in January 2023, Plaintiff had a previously identified PSA elevation greater than 4 and a pending need for urologic assessment. This history required medical personnel to evaluate the abnormal finding and arrange appropriate, timely clinical follow-up.

12. On February 13, 2023, PSA testing at USP Atlanta showed a level reported as greater than 6, approximately 6.7 ng/mL. A BOP health-problem entry made by provider C. Eziakor characterized Plaintiff’s condition as "disorder of prostate, unspecified."

13. Plaintiff requested a digital rectal examination ("DRE") and referral to an outside urologic specialist for evaluation. USP Atlanta health personnel declined to perform the requested examination, and advised him that they lacked authority to obtain specialist care.

14. From approximately February through July 2023, although providers encountered Plaintiff for other medical problems, BOP personnel did not pursue a urologic cancer workup following the elevated PSA and his requests for evaluation.

15. On July 25, 2023, outside urologist Thomas Schoborg, M.D., evaluated Plaintiff for an elevated PSA recorded at 6.71 and recommended cystoscopy and a prostate biopsy under anesthesia. Plaintiff consented. BOP records thereafter reflect an August 7, 2023, referral and a planned appointment for September 28, 2023. The recommended biopsy was not performed in 2023 as BOP personnel did not schedule and facilitate the procedure.

16. On March 20, 2024, Plaintiff's PSA was 20.54 ng/mL. The rising value was a significant warning requiring expedited assessment, completion of the recommended biopsy, and appropriate communication among the responsible providers.

17. On March 22, 2024, James Winston, M.D., reviewed the PSA and made urology and related referrals related to obtaining a prostate biopsy. Nevertheless, the biopsy did not occur until approximately June 26–28, 2024, about eleven months after Dr. Schoborg recommended biopsy.

18. The June 2024 cystoscopy and transperineal prostate biopsy, performed by Dr. Schoborg, demonstrated acinar adenocarcinoma involving both sides of the prostate: Gleason 3+4=7, Grade Group 2, in the right posterior apex, and Gleason 3+3=6, Grade Group 1, in the left posterior base. The findings required timely disclosure to Plaintiff, documentation as a cancer diagnosis, specialist follow-up, staging, and planning of treatment.

19. BOP personnel failed to inform Plaintiff of the biopsy-proven malignancy while at USP Atlanta, to ensure that he received follow-up with urology and oncology in a timely manner, and that the positive cancer diagnosis was accurately entered in the longitudinal BOP medical problem list before transfer. These failures were separate from, and compounded, the preceding delay in the biopsy.

20. On July 17, 2024, Plaintiff was transferred from USP Atlanta to FPC Montgomery. Transfer records identified an old "unspecified prostate disorder" rather than the confirmed malignant neoplasm. The transfer documentation therefore failed to convey the known biopsy-confirmed diagnosis and the need for immediate cancer-specific management.

**B. FPC Montgomery, Alabama — continuity of care, staging, and implementation of treatment**

21. After the July 17, 2024, transfer, BOP providers and clinical staff at FPC Montgomery assumed responsibility for assessment, review of the incoming records, continuity of specialist care, necessary staging, prescription administration, and arrangements to implement a definitive cancer treatment plan.

22. The medical summary reflects that Dr. Lopez discontinued certain previously pending consultations upon Plaintiff's arrival, including urologic and cardiology referrals. The BOP medical staff failed to reconcile the canceled

orders with the biopsy findings and Plaintiff's then-current need for specialty follow-up with urology and oncology.

23. On July 18, 2024, physician assistant McNeil recorded that prostate-biopsy results were pending and placed urology, oncology, and cardiology referrals. This documented a need for further evaluation; nevertheless, Plaintiff's known positive pathology was not timely incorporated into an effective care plan with the urgency warranted by a proven cancer diagnosis.

24. On August 13, 2024, Plaintiff's PSA measured 31.07 ng/mL. The continuing rise provided further objective notice that immediate follow-up, staging, and effective coordination of oncologic care were required.

25. Plaintiff was evaluated on September 25, 2024, by medical oncologist Martin C. Barnes, M.D., at Montgomery Cancer Center. His PSA was approximately 41.2 ng/mL. Dr. Barnes initiated androgen-deprivation therapy planning, administered a leuprolide injection, and recommended staging and consultations with urology and radiation oncology.

26. On or about September 27, 2024, BOP personnel requested a staging PET study, prostate MRI, radiation-oncology consultation, and follow-up oncology care. On October 4, 2024, MRI identified suspicious prostatic lesions, apparent seminal-vesicle extension, and abnormal right obturator lymph nodes.

27. On October 21, 2024, PSMA PET/CT demonstrated prostate cancer with right obturator lymph-node involvement and questionable uptake in a left external iliac lymph node, without identified bone metastasis. On October 23, 2024, Dr. Barnes classified the cancer as cT3bN1M0, Stage IVA, very high-risk disease, and a Decipher score of 0.85 was documented.

28. On October 25, 2024, radiation oncologist Alexander C. Whitley, M.D., evaluated Plaintiff and planned external-beam radiation therapy ("EBRT") combined with systemic therapy. A CT simulation was requested. On October 30, 2024, more than four months after the positive biopsy, BOP medical records finally reflected the diagnosis "malignant neoplasm of prostate."

29. Systemic treatment included leuprolide and, beginning in approximately November 2024, abiraterone with prednisone. Plaintiff alleges that access to ordered medications was delayed or interrupted on certain occasions and that staff failed to ensure consistent delivery and prompt resolution of interruptions. The particular omitted doses are evidenced in the medication-administration and pharmacy records.

30. Despite the cancer diagnosis and the specialist recommendation for radiation with systemic therapy, EBRT was not initiated while Plaintiff was at FPC Montgomery between July and December 2024. Plaintiff alleges that BOP personnel failed to carry out, expedite, and effectively coordinate the ordered

workup, radiation planning, outside appointments, and treatment transfer within medically appropriate time frames.

**C. Subsequent treatment, continuing injuries, and clinical course**

31. On December 19, 2024, Plaintiff was transferred to the Federal Medical Center at Butner, North Carolina, for further cancer treatment including radiation. The records describe further planning and referral delays at that facility.

32. On January 6, 2025, Dr Ron Allison at FMC Butner offered to develop a radiation treatment plan but could not initiate treatment because the facility was unable to facilitate a required PET scan, as the facility's PET scanner had been non-functional for over three months. Dr Allison ordered a nuclear whole-body PET scan for restaging. On January 22, 2025, Dr Michael Ryan Abern at Duke Cancer Center discussed treatment options and plaintiff elected radiation oncology and a referral to Duke Radiation Oncology was generated. This referral was never submitted for approval causing an additional two-month treatment delay.

33. On February 25, 2025, Restaging PET/CT was done showing hypermetabolic focus in the right prostatic hemisphere with suspicion in pelvic lymph nodes. On March 5, 2025, Dr Allison approved the radiation treatment plans.

34. On March 6, 2025, plaintiff received his first radiation beam therapy. The linear accelerator at FMC Butner experienced recurring equipment failures

through plaintiff's treatment including causing a missed treatment March 28, 2025. Beginning March 6, 2025, and ending May 7, 2025, Plaintiff received a course of EBRT totaling about 7,560 cGy in 42 fractions, in addition to androgen-deprivation and other systemic treatment. He has continued on leuprolide, abiraterone, and prednisone under medical supervision.

35. During and following treatment, medical records document pelvic and low-back pain, urinary frequency and incontinence symptoms, muscle cramps or spasms, lower-extremity edema, ongoing prescription treatment, and anxiety and depression associated at least in part with the diagnosis and treatment.

36. In March and April 2026, Plaintiff reported pelvic and back pain reaching approximately 7–8/10 and received analgesic treatment. Medical records from February through April 2026 continued to document PSA suppression and ongoing oncologic surveillance and treatment.

37. Plaintiff alleges that timely evaluation and biopsy in the Summer of 2023 would more likely than not have established the disease at an earlier and more treatable stage and would have reduced or avoided the nodal progression, intensified treatment, and other injury ultimately suffered.

38. Plaintiff further alleges that the post-biopsy communication failures in Georgia and the follow-up failures and implementation delays in Alabama deprived him of timely information and medically indicated care and caused additional, avoidable progression, treatment delay, symptoms, mental

anguish, and treatment burden and inability to cure the curable cancer. Those harms resulted from failures to meet the appropriate standard of care for the defendant as a custodial medical provider.

39. The acts and omissions complained of herein occurred in the course of scheduling, providing, and arranging individual medical care and in implementing existing diagnoses, medical orders, treatment recommendations, and referrals. Plaintiff's claims do not rest on a challenge to high-level, policy-based allocation of appropriations, the discretionary adoption of systemwide prison policies, or the independent negligence of outside contractors.

## COUNT I

### GEORGIA MEDICAL MALPRACTICE — DELAYED EVALUATION, REFERRAL, AND BIOPSY AT USP ATLANTA

40. Plaintiff realleges and incorporates paragraphs 1 through 39 above as if fully set forth herein.

41. This Count arises from acts and omissions at USP Atlanta between approximately February 13, 2023, and June 2024 and is governed by the substantive law of Georgia, including O.C.G.A. § 51-1-27, to the extent applicable through the FTCA. Georgia providers undertaking medical diagnosis and treatment must exercise that degree of care and skill ordinarily employed by the profession under similar circumstances.

42. The federal physicians, advanced practice providers, nurses, and health-services and administrative personnel undertaking Plaintiff's care owed duties to recognize and appropriately evaluate abnormal PSA findings; obtain and act on clinically indicated consultations; timely accomplish diagnostic follow-up; respond to material changes in laboratory results; and carry out or reasonably escalate a specialist's biopsy recommendation.

43. Acting through its federal health-services personnel at USP Atlanta, Defendant breached those duties by negligently doing or failing to do the following:

(a) Failing to make or promptly execute a reasonable plan to evaluate and follow up the February 13, 2023, elevated PSA and preexisting urology referral;

(b) Failing to provide or arrange a clinically appropriate examination and timely urologic assessment after Plaintiff repeatedly requested medical attention for his prostate condition;

(c) Failing to timely obtain, schedule, authorize, coordinate, or complete the biopsy recommended by urologist Dr. Schoborg on July 25, 2023;

(d) Failing to track the recommended biopsy through completion after the August 7, 2023, referral and anticipated September 2023 appointment;

(e) Failing to ensure that the diagnostic recommendation for biopsy was communicated, scheduled, and followed through to completion within a medically reasonable time.

(f) The clinicians responsible for maintaining and managing Dr. Beauchamp's prostate-related care should have monitored the status of the off-site urology consultation, determined whether the appointment and recommended biopsy actually occurred, obtained the consultation outcome, and taken reasonable corrective action if the referral remained uncompleted.

(g) Failing to recognize and appropriately escalate the markedly increased PSA of 20.54 ng/mL on March 20, 2024;

(h) Failing to achieve reasonably prompt biopsy following Dr. Winston's March 22, 2024, review and referrals;

(i) Failing to communicate concerning, monitor, and resolve lapses in medically indicated referral and biopsy orders; and

(j) Failing to establish and follow an individualized, medically appropriate diagnostic plan within the time required by Plaintiff's repeated abnormal PSA findings and known clinical risks.

44. These deviations breached the applicable professional standard of care. As a direct and proximate result, to the extent established by qualified expert evidence, Plaintiff's cancer diagnosis and treatment were delayed and his

disease was more advanced, causing the injuries and damages described herein and below. The United States is liable for the negligent acts and omissions of its employees under 28 U.S.C. § 1346(b)(1).

## COUNT II

### GEORGIA MEDICAL MALPRACTICE — FAILURE TO REPORT, DOCUMENT, AND ACT ON POSITIVE BIOPSY

45. Plaintiff realleges and incorporates paragraphs 1 through 44 above as if fully set forth herein.

46. This Count concerns separate negligent acts and omissions at USP Atlanta from the June 26–28, 2024 biopsy through the July 17, 2024, transfer, governed by Georgia substantive medical-negligence law, including O.C.G.A. § 51-1-27, through the FTCA.

47. After biopsy pathology identified adenocarcinoma in both lobes, the responsible BOP medical employees had a duty to obtain and review the results, communicate the diagnosis to Plaintiff, accurately document the malignancy, arrange timely specialty follow-up and staging, and transmit clinically material information to the receiving facility.

48. Defendant, through such federal employees, negligently breached those duties by:

    (a) Failing to ensure prompt review and acknowledgment of the June 2024 positive prostate-biopsy pathology;

(b) Failing to timely tell Plaintiff that his biopsy had confirmed cancer and to explain the need for urgent follow-up and staging;

(c) Failing to enter the confirmed malignant neoplasm in the BOP longitudinal medical problem list before Plaintiff's transfer;

(d) Failing to arrange timely urology and oncology follow-up after the pathology report confirmed adenocarcinoma;

(e) Failing to ensure continuity and tracking of pending cancer-related consultations, results, and medically indicated next steps; and

(f) Failing to provide FPC Montgomery with a complete and accurate transfer summary and records identifying biopsy-proven prostate cancer, the pathology results, and the need for timely specialty treatment.

49. As a proximate result of the foregoing failures, Plaintiff experienced further delay in cancer-specific care, deprivation of information necessary for informed medical decision-making, and additional harm and losses to the extent caused by those departures as outlined below from the standard of care and established by competent medical evidence.

# COUNT III

## ALABAMA MEDICAL MALPRACTICE — POST-TRANSFER EVALUATION, CLINICAL FOLLOW-UP, AND CONTINUITY OF CARE AT FPC MONTGOMERY

50. Plaintiff realleges and incorporates paragraphs 1 through 49 above as if fully set forth herein.

51. This Count concerns care at FPC Montgomery from approximately July 17, 2024, through December 19, 2024, and is based on Alabama substantive medical-negligence law, including Ala. Code §§ 6-5-548 and 6-5-551, to the extent applicable under the FTCA. Plaintiff alleges specific negligent clinical acts or omissions, with dates and circumstances as presently ascertainable.

52. BOP healthcare employees responsible for Plaintiff's care at FPC Montgomery were required to exercise the reasonable care, skill, and diligence ordinarily exercised by similarly situated medical providers under similar circumstances in assessing a patient with a known positive prostate biopsy, reconciling critical information on transfer, recognizing increasing PSA measurements, and obtaining medically indicated cancer staging and consultations.

53. Defendant, by and through its federal medical employees at FPC Montgomery, negligently breached the required standards in the following specific ways:

(a) On or about July 17–18, 2024, failing to obtain, review, reconcile, and act promptly on the positive June biopsy and omitted prostate-cancer diagnosis in incoming transfer records;

(b) On or about July 17, 2024, discontinuing or failing adequately to reconcile pending specialty referrals without providing timely alternative follow-up for the now biopsy-proven malignancy;

(c) Between July and September 2024, failing to resolve with reasonable promptness the discrepancy between the outdated unspecified-prostate-disorder entry and the confirmed cancer;

(d) After the July 18, 2024, referrals, failing to follow through with appropriate urgency on ordered urology and oncology consultations and communicate the need for expedited care;

(e) After the August 13, 2024, PSA of 31.07 ng/mL, failing to escalate and arrange appropriately prompt specialist assessment, staging, and treatment planning;

(f) Failing to ensure that clinically necessary pathology, laboratory values, consultation findings, and treatment recommendations were available to and reviewed by providers directing Plaintiff's care; and

(g) Failing to timely communicate to Plaintiff and other treating providers the severity and consequences of his confirmed malignancy and urgent treatment needs.

54. These acts and omissions caused delays and losses separate from those occurring in Georgia and, to the degree proven by competent expert testimony, further delayed medically necessary diagnosis, staging, and treatment, thereby causing avoidable injury, pain, mental anguish, or increased treatment burden and all damages as outlined below.

## COUNT IV

### ALABAMA MEDICAL MALPRACTICE — FAILURE TO TIMELY IMPLEMENT AND COORDINATE PRESCRIBED CANCER TREATMENT

55. Plaintiff realleges and incorporates paragraphs 1 through 54 above as if fully set forth herein.

56. At FPC Montgomery, the ongoing duty of care included reasonably timely implementation and coordination of specialist orders and treatment recommendations; tracking and resolving medical referrals; arranging staging and radiation-oncology planning; and ensuring continuity of prescribed cancer medication in accordance with professional standards.

57. Plaintiff alleges that the following specific acts and omissions of federal healthcare employees breached the applicable Alabama standard of care:

(a) After the September 25, 2024, oncology consultation, failing to complete or coordinate the required staging, specialist follow-up, and treatment planning within clinically appropriate intervals;

(b) After the September 27, 2024, orders and referrals, failing to track and timely resolve any delay in completion of imaging, consultation, or subsequent treatment arrangements;

(c) After the October 23–25, 2024 oncology and radiation-oncology recommendations, failing to reasonably expedite CT simulation, referral approval, scheduling, and implementation of prescribed EBRT or necessary transfer for such care;

(d) Between approximately September and December 2024, failing to ensure that the oncology team's treatment recommendations and medication prescriptions were accurately communicated and coordinated among BOP and outside providers;

(e) On occasions to be established by the medication-administration and pharmacy records, failing to timely fill, administer, continue, or seek clinician-directed resolution of interruptions in prescribed systemic anticancer medication;

(f) Failing to timely notify treating clinicians of material prescription or appointment interruptions so medically appropriate substitute action could be taken; and

(g) Failing to execute medical orders and arrange appropriate cancer-specific care during the approximately five months Plaintiff remained

at FPC Montgomery, notwithstanding known biopsy-confirmed, high-risk, node-positive disease.

58. The foregoing are allegations of negligent medical care and the negligent performance of patient-specific clinical coordination, not claims based merely on the fact that BOP exercised institutional discretion to transfer Plaintiff or to adopt budgets or systemwide policies.

59. To the extent proved by qualified expert medical evidence, these breaches caused additional avoidable delay in definitive care, prolonged untreated or incompletely treated symptoms, and increased treatment burden or harm including all damages outlined below beyond injuries already attributable to the underlying cancer and prior acts in Georgia. Defendant is liable to the extent such injury was directly and proximately caused by federal employees acting within the scope of employment.

## COMPENSATORY DAMAGES

60. As a direct and proximate result of the negligent acts and omissions set forth in the Counts above, individually and in their medically provable combination, Plaintiff has sustained and continues to sustain compensable damages, including:

(a) The incremental progression, increased stage, and/or more extensive treatment of prostate cancer to the extent that timely medically indicated care would more likely than not have avoided the same;

(b) Physical pain, discomfort, pelvic and back symptoms, and other bodily injuries and aggravations causally attributable to the negligent delays rather than unrelated preexisting conditions;

(c) Reasonably necessary medical evaluation, imaging, procedures, medication, radiation treatment, follow-up care, and future medical services to the extent attributable to the negligent conduct and recoverable under applicable law;

(d) Urinary complaints, sexual dysfunction, treatment-associated symptoms, loss of normal bodily function, and limitations on daily activities to the extent medically caused or worsened by the negligence;

(e) Past and future mental anguish, fear, distress, anxiety, depression, diminished enjoyment of life, and loss of normal activities to the extent legally compensable and supported by evidence;

(f) Appropriate compensation for any medically established permanent injury, physical impairment, or decreased life expectancy actually caused by the negligent conduct, rather than presumed from the Stage IVA diagnosis alone; and

(g) Other actual and compensatory damages established at trial and permitted by the FTCA and the governing substantive law of the place of each negligent act or omission.

61. Plaintiff does not seek duplicate recovery for the same injury. Any award shall reflect the medical causal relationship between the Georgia and Alabama acts or omissions and Plaintiff's individual, nonduplicative losses, together with any apportionment required by applicable law.

62. Moreover, the failure to complete the early recommended prostate biopsy in a medically timely manner delayed the definitive diagnosis of Dr. Beauchamp's prostate cancer and correspondingly delayed the opportunity for cancer-specific staging and timely treatment. At the time of his recommended biopsy in July 2023, he had a curable disease. Due to the delay in diagnosis and treatment, the cancer was allowed to spread in his body, changed the required treatment, greatly decreased the probability of cure, and reduced his life expectancy. This progression to a more advanced stage has caused him additional pain and suffering and diminished quality of life and will likely result in his untimely death.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff D'Livro Beauchamp, M.D. respectfully requests that the Court:

(a) Enter judgment for Plaintiff and against Defendant United States of America under 28 U.S.C. § 1346(b)(1);

(b) Award actual and compensatory damages in an amount proved at a bench trial, within the limitations of 28 U.S.C. § 2675(b), and not exceeding $50,000,000 absent a statutory basis for a greater amount.

(c) Tax allowable costs against Defendant to the extent authorized by federal law; and

(d) Grant any additional relief that is legally available under the FTCA and consistent with its waiver of sovereign immunity.

Respectfully submitted,

*/s/Keith T. BELT, JR.*
**KEITH T. BELT, JR. (ASB-6843-T79K)**
**W. RYAN MYERS (ASB-1040-A16P)**
Attorneys for Plaintiff

OF COUNSEL:
**BELT, BRUNER & BARNETT, P.C.**
880 Montclair Road, Suite 300
Birmingham, AL 35213
Phone: (205) 933-1500
Fax: (205) 933-5500
E-Mail: keithb@beltlawfirm.com
ryanm@beltlawfirm.com